578 A.2d 952

**In re J.W., A.W., V.W. and J.W., Minor Children.**

**Appeal of Joanne WERKHEISER.**

Superior Court of Pennsylvania.

Argued April 3, 1990.

Filed July 27, 1990.

380

Mark L. Newman, Asst. Public Defender, Stroudsburg, for appellant.

Arthur L. Zulick, Stroudsburg, for appellees.

Richard E. Deetz, Stroudsburg, for participating party.

Before McEWEN, MONTEMURO and KELLY, JJ.

KELLY, Judge:

In this case we are called upon to determine the effect of various procedural defaults upon appellant's appeal from an order granting a petition for involuntary termination of parental rights. We find quashal or dismissal on procedural grounds inappropriate, and reach the merits of the appeal. Nonetheless, we affirm the termination of appellant's parental rights.

## Facts and Procedural History

This case involves the fate of four children and their natural mother. Two of the children had been sexually abused by their father who committed suicide while charges were pending against him. The wife had known of the

abuse for a period of ten months but had taken no steps to protect her children from her husband's sexual abuse.[1]

The mother suffered from schizophrenia and also attempted suicide. She was treated as an inpatient at a mental hospital during involuntary commitment, followed by a brief voluntary commitment.

In the five years since her release, her employment and residence have changed erratically. Her employment changed ten times. Her residence changed thirteen times. None of the residences were suitable for a family of five.

Despite continued need for out-patient treatment, her participation in free counselling/mental health services was so sporadic that it was terminated by the provider. She subsequently failed to avail herself of other available mental health services. She ascribed her unwillingness to participate in such services to her belief that Children and Youth Services was plotting against her. The court ascribed her behavior to paranoia.

Finally, and perhaps most importantly, by the time of the last hearing in this matter she was visiting only one of her four children, and him only once every four to six weeks. She was originally authorized to visit with each of her four children twice a month.[2] Her three daughters, J.W. (dob 10/1/72), A.W. (dob 12/8/73) and V.W. (dob 9/14/76), specifically testified in favor of termination of their mother's parental rights. The fourth and youngest child, J.W. (dob 10/25/81), expressed no opinion on termination of parental

1. Under Pennsylvania law such conduct could sustain a criminal conviction for endangering the welfare of a child. *See Commonwealth v. Cardwell*, 357 Pa.Super. 38, 515 A.2d 311 (1986). The record does not disclose whether charges were ever filed against the mother for that misconduct.

2. The two older children, who were sexually abused by their father, confronted their mother on November 21, 1988, concerning her responsibility for failing to take steps to prevent continued sexual abuse of them by her husband for ten months after she became aware of the abuse. When their mother refused to take any responsibility for their abuse, the daughters understandably refused to have further contact with her. Their sister also refused to see appellant from that date forward.

rights but noted that he enjoyed "the hamburgers and toys" his mother gave him during visits.

The trial court specifically found that "the foster families have provided a stable and secure environment for the Werkheiser children for the past seven years." Trial Court Opinion at 2. Nothing in appellant's brief to this Court casts the least doubt on that evaluation; rather, it is readily apparent that the children have been quite fortunate in developing nurturing ties to their foster parents.

### *Jurisdiction*

When notice of appeal was filed in this case, a final decree had not yet been entered. Rather than exercise our discretion to quash the appeal, this panel caused the following Per Curiam Order to be entered:

### ORDER

This appeal taken from an order dismissing exceptions to a *decree nisi* terminating the appellant's parental rights. An appeal will not lie from an order denying exceptions. Entry of a final decree is necessary for appellate review. *Kopchak v. Springer,* 292 Pa.Super. 441, 437 A.2d 756 (1981) (where appellant failed to have a final decree entered on the docket, but instead appealed from order dismissing exceptions to decree nisi, appeal would be quashed). The appellant is, therefore, directed to praecipe for the entry of a final decree. Pa.R.A.P. 301. If the appellant does not submit proof of entry of a final decree on the trial court docket, within fifteen days of the date of this order, this appeal shall be dismissed.

Order of April 5, 1990.

When an order is interlocutory and unappealable, an appeal taken from the order *may* be quashed. In many cases, however, an order quashing an appeal only serves to unnecessarily delay review by causing the parties to go back to the start, praecipe a final order, and then repeat correctly completed procedures with no discernable benefit

derived over simply directing the appellant to praecipe the final order without quashing. When, as here, the case involves parental rights and the swiftly passing childhoods of four individuals, any unnecessary delay ought be avoided when practicable alternatives exist. Hence, we elected to exercise our discretion to direct appellant to perfect our jurisdiction by filing a praecipe for entry of a final decree. *See* Pa.R.A.P. 301; Pa.R.A.P. 905(a).

In response to our order of April 5, 1990, a final decree was entered April 10, 1990. Our jurisdiction was thereby perfected. *See* Pa.R.A.P. 905(a).

## *Preservation of Issues*

■■■ Review of the record reveals that appellant's exceptions were not timely filed. Failure to file timely exceptions may result in waiver of challenges on appeal. Pa.R. C.P. 227; Pa.R.C.P. 1501; *cf. Sipowicz v. Sipowicz*, 358 Pa.Super. 319, 517 A.2d 960 (1986), *appeal denied*, 516 Pa. 642, 533 A.2d 713 (1987). Thus, a second stumbling block is set in the path to review on the merits.

When, as here, however, an issue presented on appeal was raised, briefed, argued, and considered in the trial court, we *may* decline to dismiss the claim on waiver grounds. *Cf. Kurtas v. Kurtas*, 521 Pa. 105, 555 A.2d 804 (1989). Moreover, if the untimeliness of the exceptions were to result in denial of the present claim, such would constitute a procedural default, which presumably would be redressable in a subsequent collateral proceeding alleging ineffective assistance of counsel. *See In re Adoption of T.M.F.*, 392 Pa.Super. 598, 573 A.2d 1035 (1990) (*en banc*, plurality, discussing ineffective assistance of counsel in the termination of parental rights context).

There are times when reason commands that a procedural knot be swiftly severed, rather than require the parties to suffer the delay in reaching the same ultimate disposition which unravelling the knot might require. Such a time is now.

"Childhood is a small stretch of time in which events and changes can alter a life to its last day." *Karis v. Karis,* 518 Pa. 601, 607, 544 A.2d 1328, 1332 (1988). Because we cannot alter the past, we must be all the more careful of the present, which all too soon in the life of a child passes into the irretrievable past. *Id.*

In *Karis,* our Supreme Court dealt with the interest of children who were "the victims of conflicting loves" in the context of a divorce/custody dispute. Justice McDermott's cogent observations in *Karis,* of course, apply with all the more importance and urgency to children who are victims of neglect and/or abuse in the context of parental rights termination cases.

Consequently, we decline to dispose of this case on waiver grounds and risk sinking this case and these four children's sense of permanence and stability in the quagmire of collateral ineffectiveness proceedings grounded on counsel's procedural default. Rather, we will cut through appellant's problematic procedural defaults to address the substantive merits of this appeal.

## Standard of Review

In cases where there has been an involuntary termination of parental rights our scope of review is limited. We are bound by the findings of the trial court which have adequate support in the record, so long as the findings do not evince capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings. *See In re Adoption of JJ,* 511 Pa. 590, 592–95, 515 A.2d 883, 885–86 (1986); *In re G.D.G.,* 392 Pa.Super. 575, 577, 573 A.2d 612, 613 (1990); *cf. Karis v. Karis, supra,* 518 Pa.

601, 607, 544 A.2d 1328, 1332 (a similarly worded standard applies in custody appeals).

## Burden of Proof

■ Because of the constitutional significance of the parental rights involved, the party seeking termination of parental rights has the burden to establish grounds for involuntary termination by clear and convincing evidence. *See In re Adoption of J.J., supra,* 515 A.2d at 886, *citing Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see generally Zummo v. Zummo,* 394 Pa.Super. 30, ——, 574 A.2d 1130, 1138 (1990) (collecting parental rights cases). Our Supreme Court has repeatedly explained that:

> [t]he standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Matter of Sylvester,* 521 Pa. 300, 304, 555 A.2d 1202, 1203–04 (1989); *La Rocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963); *see also In re Justin S.,* 375 Pa.Super. 88, 543 A.2d 1192 (1988).

■ The custody, care, nurture, and instruction of children resides first in the children's natural parents, as a constitutionally recognized fundamental right. *See Lehr v. Robertson,* 463 U.S. 248, 257–61, 103 S.Ct. 2985, 2991–93, 77 L.Ed.2d 614, 623–29 (1983) (collecting cases). The statist notion that the government may supercede parental authority in order to ensure bureaucratically or judicially determined "best interests" of children has been rejected as repugnant to American traditions. *Parham v. J.R.,* 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979); *accord Meyer v. Nebraska,* 262 U.S. 390, 401–02, 43 S.Ct. 625, 627–28, 67 L.Ed. 1042, 1046 (1922) (noting the models of Aristotelian guardianship and Spartan state collectivization of youth and rejecting those models as antithetical to American freedoms). Moreover, it has been

repeatedly suggested, but not as yet decided, that a showing of *unfitness of the parents,* is *constitutionally* required to warrant *termination* of parental rights. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511, 520 (1978); *see also Santosky v. Kramer, supra,* 455 U.S. at 760 n. 10, 102 S.Ct. at 1398 n. 10, 71 L.Ed.2d at 611 n. 10; *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 47–48 (1977) (Stewart, J.; joined by Burger, C.J. and Rehnquist, J.).

■■■ The Juvenile Act does not empower the courts to intervene to promote the *judicially* or *bureaucratically* determined "best interests" of the children in place of the children's "bests interests" as determined by the children's parents. *In Interest of Coast,* 385 Pa.Super. 450, 561 A.2d 762, 766–68 (1989) (Johnson, J.; joined by Cavanaugh, McEwen and Popovich, JJ.); *id.,* 561 A.2d at 775, 777 (Beck, J., concurring); *id.,* 561 A.2d at 772 (Brosky, J.; Cirillo, P.J., joins). Indeed, whether or not *constitutionally* required, it is clear that under the law of this Commonwealth, "unfitness" as statutorily defined in the Juvenile Act is an indispensable prerequisite to parental rights termination. *Id.*

This Court has repeatedly affirmed that:

the Juvenile Act was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take children of the illiterate and crude and give them to the educated and cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*In Interest of Feidler,* 392 Pa.Super. 524, ——, 573 A.2d 587, 591 (1990), *quoting In Interest of S.A.D.,* 382 Pa.Super. 166, 176, 555 A.2d 123, 128 (1989). Rather, the Juvenile Act merely authorizes state agencies and the courts to intervene to ensure that parents meet certain legislatively determined irreducible minimum standards in executing their parental rights. *In Interest of Coast, supra.*

Thus, under Pennsylvania law, while parents have broad discretionary authority over their children's lives, they also

have serious concomitant *responsibilities* which the Commonwealth has a right and duty to enforce. The Juvenile Act provides the vehicle for the necessary enforcement of the irreducible minimum standards which define those parental responsibilities.

The statutory section under which appellant's parental rights were terminated reads in pertinent part:

23 Pa.C.S.A. § 2511

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without *essential parental care, control or subsistence necessary for his physical or mental well-being* and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy the conditions which led to the removal or placement of the child within a reasonable period of time, and termination of the parental rights would best serve the *needs and welfare* of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated *solely* on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care *if found to be beyond the control of the parent.*

(Emphasis added).

■ "Essential parental care, control, or subsistence necessary for [the child(ren)'s] physical or mental well-be-

ing" under Section 2511(a)(2), like the "needs and welfare" language of Section 2511(a)(5), denotes certain *irreducible minimum requirements* to which all children are entitled from their parents, including adequate housing, clothing, food, love, and supervision. *See In Re P.A.B.*, 391 Pa.Super. 79, 85, 570 A.2d 522, 525 (1990). The necessary implication of the language in the Juvenile Act is that a parent who cannot or will not meet the irreducible minimum requirements set by the Juvenile Act within a reasonable time following state intervention may properly be considered "unfit," and may properly have parental rights terminated.

■ It is universally agreed that the bond of parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other hand, a court may properly terminate parental bonds which exist *in form* but not *in substance* when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled. *See In re P.A.B.*, 391 Pa.Super. 79, 85, 570 A.2d 522, 525 (1990); *In re Angry*, 361 Pa.Super. 180, 182, 522 A.2d 73, 74 (1987). It is important to keep in mind that the essential *needs* of the child and the *responsibilities* of the parent must be considered as well as the *rights* of the parent. *In Re G.D.G.*, 392 Pa.Super. 575, 581, 573 A.2d 612, 615 (1990), *quoting In Re Adoption of J.J.*, *supra*, 515 A.2d at 891.

■ There is a statutory requirement that the state make reasonable efforts to promote family stability and preserve family unity. *See generally In Interest of Feilder*, *supra*, 573 A.2d at 588; *In Interest of S.A.D.*, *supra*, 555 A.2d at 124–25. However, when the goal of preserving the family unit conflicts with the reality of the child(ren)'s unmet irreducible essential needs, the dispositive question then becomes, to what extent may the parent be helped to

meet those needs *without* permitting those needs to go unmet. *Cf. In Interest of S.A.D., supra,* 555 A.2d at 126, *citing Interest of Ryan Michael C.,* 294 Pa.Super. 417, 421, 440 A.2d 535, 536 (1982).

The Commonwealth's self-imposed obligation to help the parents assume their irreducible minimum parental responsibilities is not indefinite, nor has the Commonwealth made itself guarantor of the success of efforts to help parents assume their parental duties. Rather, parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re G.D.G., supra,* 573 A.2d at 615–16. Our Supreme Court has explained *the parents duty* unequivocally as follows:

"We think this affirmative duty, *at a minimum requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities.* The agency must, of course, put forth a good faith effort *in making services available to the parent,* and once it has done so on a continuing basis, it has discharged this obligation."

*In Interest of J.J., supra,* 515 A.2d at 890. A parent's avowed intent to cooperate in a remediation program at the eleventh hour, after a long period of uncooperativeness as to the utilization of necessary and available services, may properly be rejected as untimely and/or insincere. *Cf. Commonwealth ex rel. M.D. v. M.D.,* 392 Pa.Super. 49, 54, 572 A.2d 227, 229–30 (1990); *In re Adoption of J.F.,* 392 Pa.Super. 39, 46–47, 572 A.2d 223, 226–27 (1990).

### *Appropriateness of Termination of Parental Rights*

On the merits, we have no hesitancy in affirming the termination of appellant's parental rights. Succinctly, the record fully sustains the trial court's conclusion that appellant has neither the capacity nor the inclination to take the remedial steps required to meet the irreducible minimum parenting skills necessary to perform parenting functions for the four children involved in this case, either now

or in the foreseeable future. Lamentable as termination of parental rights is, it is both necessary and appropriate in this case.

Appellant asserts that she has always asserted a desire for reunification, she is now willing to fully cooperate in any program of therapy or education required, and that her case worker had undermined her from the start. We find these arguments entirely unpersuasive.

Appellant, in fact, has always avowed her intent to perform a parental role toward her children. However, adequate parenting requires *action* as well as *intent*. During the five year period between the date of her release from in-patient mental health treatment and the date of the final termination hearing held in this case, appellant's *actions* fell far short of her *avowed intent* to acquire the irreducible minimum parenting skills required.

Shortly before the termination hearing, appellant, *on advice of counsel*, scheduled an appointment with Mental Health Services and indicated her willingness to follow any program they prescribed. The trial court rejected this evidence of appellant's intent to reform as untimely and incredible. We find no abuse of discretion. Avowals of remorse or intent to reform made from the bar of a court (or within its shadow) are generally deemed to ring hollow; indeed, the evanescent nature of such pledges is proverbial. *Cf. In Interests of J.J., supra; In re G.D.G., supra; Commonwealth ex rel. M.D. v. M.D., supra; In re Adoption of J.F., supra.*

Finally, appellant attempts to shift the responsibility for her failure to make progress toward reunification onto Children and Youth Services, and her case worker in particular. No evidence was presented that appellant was denied services or opportunities provided to similarly situated persons. Rather, appellant makes a general claim that her efforts (unspecified) were undermined by the case worker's expressed intent to seek termination of parental rights. There is, inherent in this argument, a credibility question which the trial court resolved in favor of the case worker

and CYS. The trial court specifically dismissed appellant's claim of a plot against her as mere "paranoia." Trial Court Opinion at 7. *Cf. In re G.D.G., supra.* The record sustains that conclusion.

 Assuming, *arguendo*, that the case worker had expressed to appellant some opposition to reunification (even at an early date in the process) and that the case worker's opposition to reunification deflated appellant's hopes and expectations, such would hardly be remarkable or improper in this case. While CYS and case workers have a duty to promote reunification *by providing assistance to parents working toward that goal;* they have *no obligation* to force parents to make such efforts, to guarantee the success of such efforts, or to promote unreasonable expectations concerning such efforts regarding the prognosis for reunification.[3]

It is important to remember the context in which CYS's involvement arose in this case. The family was living in an unsanitary, garbage strewn residence, the father was sexually abusing his two oldest daughters, and the mother was aware of this for ten months but took no steps to prevent her husband's sexual abuse of her own pre-teenage daughters. After the children were placed in state care, the father committed suicide, the mother attempted suicide, and then the mother was treated for schizophrenia as an in-patent in a mental hospital for 15 months. Moreover, the mother's irratic and irresponsible conduct after her release strongly reinforced the original negative prognosis for reunification. Indeed, appellant resisted all assistance and took no discernable steps toward acquiring the skills and means to perform her parental responsibilities until on the

---

3. We are not faced here with a question of whether the statutory duty to promote family stability and unity requires futile efforts to preserve a family unit in the face of egregious child abuse by parents. Here, efforts to preserve the family unit were plainly made and it is the *adequacy* of those efforts which is questioned. Hence, we do not reach the broader, more problematic issue of whether children must be further traumatized in the futile pursuit of family unity where the abuse was egregious and the damage to the parental bond was irreparable.

eve of termination, *on the advice of counsel,* she suddenly announced her intent to abandon all resistance and cooperate fully in any program prescribed.

How in this context could CYS or the case worker be faulted for recognizing the painful realities in this case, or in preparing for eventual and inevitable termination of parental rights? The trial court found no fault in CYS or the case worker. Neither do we.

These children have been repeatedly victimized by parental neglect and abuse during their short lives. What little solace may be had by the establishment of nurturing ties to foster and/or adoptive parents, and/or by the development of stability and a sense of permanence in their lives at this late date in their childhoods was their right to ask of this Commonwealth. It was a request the trial court was fully empowered to grant under the circumstances presented.

Order Affirmed.